UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |
|---|---|
| WALTER JENNINGS, | |
| Plaintiff, | Case No. 3:19-cv-00065 |
| v. | Judge Eli J. Richardson |
|  | Magistrate Judge Alistair E. Newbern |
| SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

To:     The Honorable Eli J. Richardson, District Judge

## REPORT AND RECOMMENDATION

Plaintiff Walter Jennings seeks judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401–34. (Doc. No. 1.) The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions. (Doc. No. 7.) Now before the Court is Jennings's motion for judgment on the administrative record (Doc. No. 26), to which the Commissioner has responded in opposition (Doc. No. 28). Having considered these filings and the administrative record as a whole (Doc. No. 19), and for the reasons given below, the Magistrate Judge will recommend that Jennings's motion be granted, that the Commissioner's decision be reversed, and that this case be remanded for further administrative proceedings consistent with this report and recommendation.

## I. Background

### A. Jennings's Application for Disability Insurance Benefits

Jennings applied for DIB on July 8, 2015. (AR 15, 247–50[1].) He alleged that, since April 22, 2014, he has been disabled due to severe lumbar vertebrae damage and infection; untreated herniated discs in the cervical and lumbar spine; straightening of the cervical lordotic curve; a rotator cuff and labral tear which required surgery and resulted in limited use; carpel tunnel syndrome in the wrists and nerve slowing across the elbows; permanent nerve damage; left hemispheric slowing in the brain; chronic arthritis in the left knee; and prediabetic hypoglycemia. (AR 290.) The Commissioner denied Jennings's application initially and on reconsideration. (AR 117–18, 131–32.) Jennings requested a hearing before an administrative law judge (ALJ), which was held on February 21, 2018, in Nashville, Tennessee. (AR 15, 30–68, 143–44.) Jennings appeared at the hearing with counsel and testified. (AR 35–39, 41–57.) The ALJ also heard testimony from Merrill Cohen, a vocational expert. (AR 39–40, 57–65.)

On June 14, 2018, the ALJ issued a written decision finding that Jennings had not been disabled from the alleged onset date of April 22, 2014, through the date of the decision. (AR 15–24.) In reaching that conclusion, the ALJ made the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2020 (5D).

2.  The claimant has not engaged in substantial gainful activity since April 22, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).

\*       \*       \*

---

[1]     The Transcript of the Administrative Record (Doc. No. 19) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

3. The claimant has the following severe impairments: non-displaced fracture at C4, seizure disorder, status post appendic[e]al cancer, status post right rotator cuff surgery, and headaches (20 CFR 404.1520(c)).

\* \* \*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

\* \* \*

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit/ stand/ walk six hours; frequently stoop, crouch, and kneel; no crawling; frequently balance; no limits on hearing seeing or speaking; frequently climb stairs and ramps; no climbing of ladders, ropes, or scaffolds; frequently reach bilaterally in all directions including overhead; frequent fingering, feeling and handling; should avoid concentrated exposure to dusts, fumes, odors, gases, smoke irritating inhalants, and areas of poor ventilation; should avoid concentrated exposure to vibrations; frequent use of hands and feet for the operation of controls; should avoid concentrated exposure to extreme heat and cold; can work at heights and near bodies of water when protected from falls; should avoid working with or near dangerous and moving type of equipment or machinery, to include dangerous moving type of parts; no operation of motor vehicles, no work with sharp cutting type of instruments or with and near items that can cause burns such as stoves or ovens, avoid concentrated exposure to loud noises but can work in a typical office environment with noise levels equal to keyboarding, telephone rings, copier and printer noises and conversational talk; should avoid concentrated exposure to bright lights but can work in a typical office type of overhead lights.

\* \* \*

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

\* \* \*

7. The claimant was born on September 24, 1971 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

\*   \*   \*

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 22, 2014, through the date of this decision (20 CFR 404.1520(g)).

(AR 17–23.) The Social Security Appeals Council denied Johnson's request for review on October 31, 2018, rendering the ALJ's June 14, 2018 decision the final decision of the Commissioner. (AR 1–5.)

## B.    Appeal Under 42 U.S.C. § 405(g)

Jennings filed this civil action for review of the ALJ's decision on January 9, 2019 (Doc. No. 1), and the Court has jurisdiction under 42 U.S.C. § 405(g).[2] Jennings argues that the ALJ's finding that he is capable of performing a reduced range of light work is not supported by substantial evidence and that the ALJ erred in analyzing Jennings's symptoms. (Doc. No. 26.) The

---

[2]    Section 405(g) requires a claimant seeking judicial review of the Commissioner's final decision to file a civil action "within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner . . . may allow." 42 U.S.C. § 405(g). Section 405(g)'s implementing regulation clarifies that the date of "mailing" is the date that the Appeals Council's notice of final decision is received by the claimant, which is "presumed to be 5 days after the date of such notice, unless there is a reasonable showing to the contrary." 20 C.F.R. § 422.210(c). Accordingly, in most cases, a claimant must file a civil action challenging the final decision of the Commissioner within 65 days of the date on the Appeals Council's notice of final decision. *See Cook v. Comm'r of Soc. Sec.*, 480 F.3d 432, 437 (6th Cir. 2007) (holding that the 65-day period is calculated "from the date on the notice itself"). Here, the Appeals Council's notice of final decision is dated October 31, 2018, and Jennings filed this action on January 9, 2019, 70 days later. However, the Commissioner does not argue that Jennings's complaint is untimely, and it is well established that § 405(g)'s limitations period is non-jurisdictional, *id.* at 435, and subject to waiver, *Willis v. Sullivan*, 931 F.2d 390, 396 (6th Cir. 1991).

4

Commissioner responds that the ALJ's residual functional capacity is supported by substantial evidence and that the ALJ properly analyzed Jennings's symptoms. (Doc. No. 28.) Jennings did not file a reply.

### C. Review of the Record

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of the administrative record. Accordingly, the record will only be discussed to the extent necessary to address the parties' arguments.

## II. Legal Standard

### A. Judicial Review of Social Security Appeals

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405–06 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the

conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

**B.**     **Administrative Evaluation of Disability Claims**

Jennings applied for DIB under Title II of the Social Security Act, which is an insurance program that "provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need." *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988). To receive DIB, Jennings must establish that he had a disability on or before the last date he was eligible for insurance under Title II, which is determined based on his earnings record. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.130. "Disability" in this context is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ considers the claimant's work activity. *Id.* § 404.1520(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the Social Security Administration that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459

6

F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. § 404.1520(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the ALJ proceeds to step four. *Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:17-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted by* 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [his] limitations.'" *Combs*, 459 F.3d at 643 (first alteration in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. § 404.1520(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b). If the claimant's residual functional capacity (RFC) permits him to perform past relevant work, he is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of [his] residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. § 404.1520(a)(4)(v).

7

**III.     Analysis**

Jennings raises two arguments on appeal. First, Jennings argues that substantial evidence does not support the ALJ's finding that Jennings can perform a reduced range of light work. (Doc. No. 26.) Second, Jennings argues that the ALJ failed to properly analyze his symptoms. (*Id.*) Only the first argument has merit.

**A.     Whether the ALJ's RFC Is Supported by Substantial Evidence**

Jennings's assertion that the ALJ's RFC is not supported by substantial evidence consists of three arguments. First, Jennings argues that the ALJ failed to adequately consider Jennings's depression and cognitive impairment in constructing the RFC. (Doc. No. 26.) Second, Jennings argues that the ALJ repeatedly omitted other relevant evidence in constructing his RFC. (*Id.*) Finally, Jennings argues that the ALJ did not give good reasons for discounting the opinions of three treating physicians. (*Id.*)

**1.     Jennings's Mental Impairments**

At the outset of his opinion, the ALJ rightly defined Jennings's RFC as his "ability to do physical and mental work activities on a sustained basis despite limitations from his impairments." (AR 16); *see also* SSR 16-3P, 2016 WL 1119029, at *11 (Mar. 16, 2016) ("An individual's residual functional capacity is the most the individual can still do despite his or her impairment-related limitations."). Because mental function is an essential aspect of a claimant's ability to work, an ALJ must consider mental impairment in crafting the RFC. *See* 20 C.F.R. § 404.1545(c) ("A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work.").

However, as Jennings indicates, there is no discussion of his mental function in the ALJ's RFC assessment. The only reference to Jennings's mental health in the ALJ's opinion is the following sentence at step two of the sequential evaluation process: "Depression is not a severe impairment and the evidence shows no mental limitation or sustain[ed] treatment for any mental condition." (AR 17.) To Jennings, that sentence is a mischaracterization of the evidence and demonstrates that the ALJ did not consider his mental impairments in constructing his RFC.[3] (Doc. No. 26.) Jennings argues that the record contains significant evidence of mental limitation and points to his history of treatment for depression and diagnosis of cognitive impairment. (*Id.*)

The administrative record shows that Jennings has seen various doctors for treatment of depression. During a physical examination with Dr. Jose Sanchez Chavez on January 29, 2016,

---

[3]       Jennings also argues in passing (Doc. No. 26) that the ALJ's step-two analysis violated 20 C.F.R. § 404.1520a(a), which provides "a 'special technique' for evaluating the severity of a mental impairment at steps two and three." *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 652 (6th Cir. 2009) (quoting 20 C.F.R. § 404.1520a(a)). That technique requires the ALJ to analyze any medically determinable mental impairment with respect to four functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. 20 C.F.R. § 404.1520a(b)(2), (c)(3). Use of that technique enables the ALJ to determine at step two whether a given mental impairment is severe, and at step three, whether the mental impairment meets or medically equals the requirements of a listing. The ALJ's "written decision must incorporate the pertinent findings and conclusions based on the technique" and "include a specific finding as to the degree of limitation in each of the [four] functional areas . . . ." *Id.* § 404.1520a(e)(4). Jennings points out that the ALJ's step-two analysis contains no such findings. (Doc. No. 26.) The Commissioner concedes that the ALJ violated 20 C.F.R. § 404.1520a by failing to document use of the special technique in his opinion but argues that the violation amounts to harmless error, citing *Rabbers v. Commissioner Social Security Administration*. (Doc. No. 28.) Jennings does not respond to that argument.

       In *Rabbers*, the Sixth Circuit held that failure to use the special technique is harmless if proper application of the technique would have led to the same result at steps two and three. 582 F.3d at 658. Here, the ALJ's failure to document use of the special technique at steps two and three is harmless under *Rabbers*. Jennings does not argue that the ALJ should have found any of his mental impairments to be severe at step two, nor does he argue that those impairments, or any of his impairments, met or medically equaled the requirements of a listing. In the absence of such argument, the ALJ's failure to properly apply the special technique was harmless.

Jennings reported that, six to seven days a week, he was feeling hopeless and depressed and having trouble concentrating. (AR 735.) After conducting a standardized depression screening, Dr. Chavez found that Jennings exhibited "clinically significant symptoms[;]" diagnosed him with major depressive disorder, single episode, moderate; and prescribed him the antidepressant Fluoxetine. (AR 740.) Dr. Chavez also referred Jennings to psychiatrist Dr. Samuel Mowerman. (AR 729.) In an initial evaluation of Jennings on February 2, 2016, Dr. Mowerman recorded that Jennings had been feeling "depressed, with poor motivation, anhedonia and poor sleep for about 1 year." (*Id.*) Dr. Mowerman also noted that Jennings had not yet started taking the Fluoxetine that Dr. Chavez prescribed because he wanted to see Dr. Mowerman first. (*Id.*) Jennings explained that "his life ha[d] turned all around ever sin[c]e he experienced a seizure while a[t] work that cause him spine injuries, severe headaches, [and] shoulder . . ." problems. (*Id.*) Dr. Mowerman diagnosed Jennings with adjustment disorder with depressed mood and prescribed him the antidepressant Cymbalta. (AR 729–30.) Jennings saw Dr. Mowerman several times over the following months. Dr. Mowerman continued to document clinically significant symptoms of depression and prescribed a second antidepressant, Mirtazapine. (AR 712–17.) At Jennings's last appointment with Dr. Mowerman on May 31, 2016, Jennings reported that it was "difficult to feel happy with pain" and complained "of lack of energy and difficulties in getting motivated . . . ." (AR 701.) Dr. Mowerman added a thirty-day prescription of the antidepressant Bupropion. (AR 703.)

Dr. Stephen Weirich treated Jennings for various conditions and monitored his depression from May through August of 2016. During appointments on May 10, 2016, and June 3, 2016, Dr. Weirich documented clinically significant symptoms of depression and reviewed Jennings's medications, including his antidepressants. (AR 694–97, 705–08.) On August 1, 2016, Jennings presented to Dr. Weirich complaining of acute appendicitis and seeking a referral for surgery,

which the doctor provided. (AR 689, 692.) Dr. Weirich listed adjustment order with depressed mood as one of Jennings's active problems and noted that Jennings was taking Cymbalta and Mirtazapine. (AR 689, 690.) On February 6, 2017, Jennings presented to Dr. Alex Fruin complaining of pain stemming from appendicitis. (AR 1059.) Dr. Fruin's exam notes indicate that Jennings was suffering from depression and that he was taking Cymbalta and Mirtazapine.[4] (AR 1059–60.) Dr. Fruin's May 2, 2017 exam notes also show that Jennings was still taking those antidepressants. (AR 1085.)

Throughout his treatment for depression, Jennings also complained of cognitive impairment, regularly reporting that he was having trouble concentrating most days of the week. (AR 702, 718, 727, 732, 735.) On March 24, 2016, Jennings presented to neurologist Dr. Carrie Landess, stating that despite taking Tegretol, his anti-seizure medication, he had been having seizures about once a week.[5] (AR 1105.) Although he was not sure when his last seizure occurred, he guessed that he probably had one about three days prior, when he blacked out while washing dishes and came to on the couch, unsure of how he had gotten there. (*Id.*) Jennings also complained that, for the past two years, he had been experiencing cognitive impairment, struggling to remember words and forgetting what he is doing. (*Id.*) Dr. Landess conducted a standardized mini-mental status examination and found that Jennings exhibited a cognitive deficit. (AR 1106–07.) Among other things, she diagnosed Jennings with depression, tonic-clonic epilepsy, and impaired cognition. (AR 1107.) Dr. Landess ordered a Neurotrack cognitive function assessment and various other tests. (AR 1107.)

---

[4]     These notes refer to Duloxetine, which is the generic name of the drug sold as Cymbalta. *See Duloxetine*, Wikipedia, https://en.wikipedia.org/wiki/Duloxetine (last visited Feb. 25, 2020).

[5]     The ALJ incorrectly spells Dr. Landess's name "Landress[.]" (AR 19.)

11

Jennings took the Neurotrack assessment on March 28, 2016. The assessment consisted of the following tests: "GoNoGo, Verbal Memory, Problem Solving, Stroop Interference, NonVerbal Memory, Finger Tapping, Catch Game, Staged Info Proc, Verbal Function, [and] Visual Spatial Processing." (AR 1104.) Dr. Landess compared Jennings's performance on the assessment to a group of cognitively healthy individuals of a similar age and education and found that Jennings was more than one standard deviation below average in the cognitive domains of memory, executive function, attention, visual and spatial function, and verbal function. (*Id.*) Jennings saw Dr. Landess several times after taking the Neurotrack assessment. Jennings continued to complain of seizures and headaches, and Dr. Landess continued to diagnose him with epilepsy and cognitive impairment. (AR 1091–1103.) At Jennings's last appointment with Dr. Landess on July 19, 2016, Jennings was advised that he should not drive. (AR 1093.)

Jennings's testimony provides further evidence of cognitive impairment. At the February 21, 2018 hearing, when Jennings was asked whether he had noticed any change in his ability to maintain attention and concentration and focus on a given activity, he answered:

> Yes, sometimes I - - I feel like I drift a little bit maybe. Like, I'm like trying to do something like, I don't know, go pick up a remote and then I kind of forget what I was doing. I have to kind of think about it a little bit. Or I might be going to make a phone call, you know, and sometimes I forget the number of who I'm calling. You know.

(AR 56.) Similarly, in his October 26, 2015 function report, Jennings indicated that his conditions affect his memory, concentration, ability to complete tasks and follow instructions, his understanding, and his ability to get along with others. (AR 316.)

The Sixth Circuit has held that an ALJ's decision not to address a claimant's mental impairment in the RFC amounts to reversible error when that decision is not supported by substantial evidence. In *White v. Commissioner of Social Security*, the ALJ concluded at step two

of the sequential evaluation process that the claimant's adjustment disorder was not severe, stating incorrectly that the antidepressant that he had been prescribed was intended more to address pain relief and sleep assistance than depression. 312 F. App'x 779, 787 (6th Cir. 2009). In constructing the claimant's RFC, "the ALJ gave no explanation for totally discounting the objective evidence of [the claimant's] mental impairment . . . [,]" including his treatment for depression with prescription medication. *Id.* The court held that, because the ALJ had inaccurately concluded at step two that the antidepressants were not prescribed for treatment of depression, his "total discounting of the mental impairment" at the RFC stage was not supported by substantial evidence and required reversal. *Id.* at 788. That was so even though the doctor who treated the claimant for depression had not "note[d] any limitations caused by [the claimant's] mental impairment . . . ." *Id.* at 787.

In *Simpson v. Commissioner of Social Security*, the ALJ found at step two that the claimant's adjustment disorder with mixed anxiety and depressed mood was not severe because the claimant did not suffer any limitations from that impairment. 344 F. App'x 181, 190 (6th Cir. 2009). The ALJ then explicitly stated that the claimant's mental impairment would not be considered in constructing the RFC. *Id.* The Sixth Circuit found reversible error, explaining that it is

> "legally irrelevant" that some of a claimant's impairments [are] considered non-severe, when others [are] found to be severe, because a finding of severity as to even one impairment clears the claimant of step two of the analysis and should cause the ALJ to consider both the severe and non-severe impairments in the remaining steps.

*Id.* (quoting *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)). The court also concluded that, because there was "uncontradicted objective medical evidence demonstrat[ing] that [the claimant] suffered a series of limitations because of her mental disorder, . . . the ALJ's finding that

13

she suffered no limitations was a clear mischaracterization of the facts" that amounted to reversible error. *Id.* at 191.

Application of these principles here requires reversal. The ALJ's RFC assessment contains no discussion of Jennings's depression or cognitive impairment. And the reasons that the ALJ offered at step two to support that omission are not supported by substantial evidence. The ALJ concluded that the record lacks evidence of sustained treatment for any mental condition, but Jennings saw three doctors over the course of six months for treatment of his depression and was prescribed antidepressants for almost a year and a half. Further, the ALJ's finding that the evidence shows no mental limitation is contradicted by the results of the standardized mini-mental status examination, the Neurotrack assessment, Jennings's consistent complaints of problems with concentration and memory, and Dr. Landess's repeated diagnoses of cognitive impairment. The ALJ's one-sentence assessment of Jennings's mental function was thus "a clear mischaracterization of the facts" that constitutes reversible error. *Simpson*, 344 F. App'x at 191; *see also White*, 312 F. App'x at 788; *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1270 (11th Cir. 2019) (holding that RFC was inadequate where "ALJ provided no real assessment of how [claimant's] mental impairments—including depression, mania, and anger, affected his ability to work").

The ALJ's failure to analyze Jennings's mental function in constructing his RFC is especially conspicuous given that, at the hearing on Jennings's application, the ALJ presented the vocational expert with a hypothetical that involved mental impairment. The ALJ asked the vocational expert to consider whether a claimant who could do specified jobs at light, medium, and sedentary exertion levels would still be able to do those jobs if he had headaches and "pain to the degree that his ability to maintain attention, concentration and pace and be focused on his job

14

duties . . . [were] restricted to 80 percent of the workday . . . ." (AR 61.) The vocational expert responded that someone who was on-task 80 percent of the time and off-task 20 percent of the time would not be able to maintain employment. (AR 62.) That hypothetical shows that the ALJ considered a more limited mental RFC than the one that was adopted, but provided no explanation for that decision in his opinion. This further supports reversal. *See Richards v. Astrue*, 370 F. App'x 727, 733 (7th Cir. 2010) (reversing the ALJ's denial of benefits where she "apparently contemplated a more limited mental RFC during the hearing . . . but abandoned [those] limitations without explanation in her final decision").

Finally, the Commissioner does not respond directly to Jennings's argument that the ALJ erred by failing to analyze his mental impairments in constructing his RFC. Instead, the Commissioner defends the ALJ's finding at step two of the sequential evaluation process that Jennings's depression was not a severe impairment by arguing that any error there was harmless because Jennings "asserts no actual limitations [from his mental impairment] and the ALJ found no sustained limitations exceeding 12 months." (Doc. No. 28, PageID# 1344.) But, as the Sixth Circuit explained in *Simpson*, once the ALJ found that Jennings suffered from several severe impairments at step two, he was required to consider "'the combined effect of all impairments . . .'" in constructing the RFC, including impairments, like Jennings's depression, that were found not to be severe. 344 F. App'x at 190 (quoting *White*, 312 F. App'x at 787); *see also* 20 C.F.R. § 404.1545(a)(2). Further, the Commissioner's description of Jennings's argument and the ALJ's findings at step two is inaccurate. Jennings *does* assert limitations from his mental impairments, pointing to evidence of problems with memory, concentration, and attention. And the ALJ did not find that the record lacked evidence of "sustained [mental] limitations exceeding 12 months" (Doc. No. 28, PageID# 1344)—rather, the ALJ stated that the record completely lacked evidence of

15

mental limitation and sustained treatment for any mental impairment. As already explained, the record contradicts that finding.

The ALJ ignored Jennings's mental impairments in constructing his RFC and the reasons the ALJ offered at step two to justify that decision are not supported by the record. Accordingly, the RFC that the ALJ adopted is not supported by substantial evidence. This case should be remanded to allow for proper consideration of the combined effect of all of Jennings's impairments, including those that affect his mental function.

## 2. Overlooked Evidence

Jennings argues that the ALJ erred by overlooking the following evidence from: (1) his treatment at Miami Beach Community Health Center (MBCHC) from April 2014 to October 2014; (2) his treatment with Dr. Bruce Kohrman in March 2015; (3) a March 2015 MRI of the lumbar spine; and (4) his treatment with Dr. Landess from March 2016 to July 2016. (Doc. No. 26.)

Regarding Jennings's treatment at the MBCHC, the ALJ wrote that, "[f]rom April 2014 to October 2014, [Jennings] presented . . . for follow-up of headaches, pain post-right rotator cuff surgery, and tingling in all four extremities (1F/2F). He was treated with medication and underwent physical therapy (1F-3F)." (AR 19.) Jennings criticizes the ALJ for omitting that he was treated by a physician's assistant (PA) instead of a doctor. (Doc. No. 26.) Jennings also objects that the ALJ did not discuss any of the PA's examination findings, such as tenderness to palpation at the costochondral junction bilaterally, or diagnoses, which included carpal tunnel syndrome and rib sprain. (Doc. No. 26); (AR 369–70.)

Jennings complains that the ALJ's discussion of his treatment with Dr. Kohrman, a neurologist, is limited to the following summary of Jennings's March 10, 2015 examination: "cervical spine range of motion was mildly decreased in all directions with bilateral middle to

16

lower cervical and trapezius muscle spasm that was tender to palpation without associated trigger points. The lumbar spine was diffusely tender over the spinous process and paraspinous process without trigger point." (AR 19.) Excluded from that summary are Dr. Kohrman's observation that Jennings appeared uncomfortable and Dr. Kohrman's diagnoses of cervicalgia, cervicobrachial syndrome (diffuse), lumbago, sciatica, disturbance of skin sensation, syncope and collapse, and convulsions. (AR 466.) Jennings also points out that the ALJ did not mention Jennings's other appointment with Dr. Kohrman on March 25, 2015. (AR 319.) The examination findings and diagnoses at the second appointment largely mirror those of the first, except that Dr. Kohrman added diagnoses of carpal tunnel syndrome and lesion of the ulnar nerve. (AR 319–23.)

With respect to the April 1, 2015 MRI of Jennings's lumbar spine, the ALJ wrote that it showed "desiccation of the disc at L5-S1, with what appeared to be a left paracentral focal disc protrusion." (AR 19.) Jennings states that the ALJ failed to mention that the MRI contained the following additional findings:

> There is a slightly expansile T2 bright and T1 dark and lytic appearing lesion within the S1 vertebral body. This appears to extend beyond the anterior cortex. In addition there is a left paracentral posterior soft tissue density which may represent a focal disc protrusion. This effaces the fat around the left S1 nerve root within the lateral recess.

(AR 477.) Finally, Jennings points out that the ALJ's discussion of his treatment with Dr. Landess overlooked various physical examination findings, including decreased strength in Jennings's arms and legs, diminished reflexes, and tenderness to palpation of his neck and decreased range of motion. (Doc. No. 26.)

Jennings has not shown that any of the ALJ's omissions constitute reversible error. As the Commissioner argues, "the ALJ need not expressly mention every piece of evidence so long as the overall decision was supported by substantial evidence." *Noto v. Comm'r of Soc. Sec.*, 632 F.

17

App'x 243, 250 (6th Cir. 2015) (citing *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Jennings does not attempt to explain how the allegedly overlooked evidence is inconsistent with the physical RFC that was adopted. No such inconsistency is independently apparent and therefore reversal on this ground is not warranted. *See Henry v. Colvin*, No. 1:12-cv-2374, 2013 WL 5353689, at *13 (N.D. Ohio Sept. 23, 2013) (finding that ALJ's alleged errors in assessing the evidence were not reversible where the plaintiff had "not explain[ed] how his RFC would have been different had the ALJ properly described the evidence").

### 3.    The Treating Physician Rule

Jennings argues that the ALJ violated the treating physician rule by failing to provide good reasons for the weight given to the opinions of Dr. Kohrman, Dr. Landess, and Dr. Mowerman. (Doc. No. 26.) This argument is buried within Jennings's summary of the evidence that he claims the ALJ overlooked, and Jennings's application of the treating physician rule consists of a single sentence. (*Id.*) Perhaps because of Jennings's cursory presentation of this argument, the Commissioner does not respond to it directly, asserting only that the ALJ properly considered the opinion evidence. (Doc. No. 28.)

The treating physician rule provides that, when the opinion of a treating physician concerning the nature and severity of a claimant's condition is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," the ALJ must give that opinion controlling weight in his analysis.[6] 20 C.F.R. § 404.1527(c)(2). Not every statement and treatment note from a

---

[6]     A treating physician is one who "provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1527(a)(2).

treating physician is an opinion that triggers the treating physician rule. *See Bass v. McMahon*, 499

F.3d 506, 510 (6th Cir. 2007) ("Since Dr. Naum made no medical judgments, the ALJ had no duty

to give such observations controlling weight or provide good reasons for not doing so"). Under 20

C.F.R. § 404.1527(a)(1), a medical opinion is defined as a statement that "reflect[s] judgments

about the nature and severity of [the claimant's] impairment(s), including [the claimant's]

symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and

[the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). An ALJ may decline

to adopt a treating physician's opinion, but only if the ALJ provides "good reasons" for that

decision. *Id.* § 404.1527(c)(2).

Jennings's argument based on the treating physician rule is too perfunctory to have merit.

After summarizing his treatment with Dr. Kohrman, Dr. Landess, and Dr. Mowerman, Jennings

concludes, without identifying the relevant medical opinions or diagnoses, that the ALJ violated

the treating physician rule. (Doc. No. 26.) This conclusory claims is simply inadequate to raise an

objection to the ALJ's opinion based on that rule. It is not the Court's job to piece together this

argument for Jennings. *See Coloske v. Comm'r of Soc. Sec.*, No. 12-15198, 2014 WL 1048156, at

\*16 (E.D. Mich. Mar. 18, 2014) (finding that claimant had not adequately raised objection based

on the treating physician rule where the claimant argued in a single sentence that ALJ had not

given adequate weight to physician's questionnaire). Reversal is not warranted on this ground.

### B.  The ALJ's Analysis of Jennings's Symptoms

Jennings argues that the ALJ erred by finding that the limiting effect of his alleged

symptoms is not entirely consistent with the evidence in the record. (Doc. No. 26.) Jennings claims

that, to the contrary, his  "self-reported symptoms and limitations are . . . consistent with his own

hearing testimony as well as his treating source's findings, diagnoses, and opinions . . . ." (*Id.* at

19

PageID# 1328.) The Commissioner responds that the ALJ's finding concerning Jennings's symptoms is supported by substantial evidence. (Doc. No. 28.)

To determine whether an individual is disabled, an ALJ must "consider all of the individual's symptoms"—namely, the individual's own description of his or her impairments—and "the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3P, 2016 WL 1119029, at *2; *see also* 20 C.F.R. § 404.1529(a). A two-step evaluation process applies to symptoms. SSR 16-3P, 2016 WL 1119029, at *2; *Amir v. Comm'r of Soc. Sec.*, 705 F. App'x 443, 449 (6th Cir. 2017). The ALJ must first decide whether an "underlying medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce [the] individual's symptoms, such as pain." SSR 16-3P, 2016 WL 1119029, at *2. If so, the ALJ must analyze the "intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the] individual's ability to perform work-related activities . . . ." *Id.* Factors relevant to that analysis include:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

20

*Id.* at *7; *see also* 20 C.F.R. § 404.1529(c)(3)(i)–(vii).

An ALJ's findings with respect to an individual's symptoms receive "special deference." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017), *aff'd sub. nom Biestek v. Berryhill*, 139 S. Ct. 1148 (2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, [the Court is] not to second-guess . . . ." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). However, the ALJ may not "cherry-pick[ ] select portions of the medical record to discredit [the claimant's] complaints of pain." *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013).

Here, the ALJ considered Jennings's testimony that "that he is unable to lift his arm above his shoulder, has hand pain, headache pain, and suffered seizures along with daily neck and back pain flare-ups" as well as his claim that he can only lift about ten pounds and sit for ten minutes at a time without changing positions. (AR 19.) The ALJ found that, although Jennings's impairments could reasonably be expected to cause some of the alleged symptoms, Jennings's "statements concerning the intensity, persistence and limiting effects of [those] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (*Id.*) The ALJ offered several reasons to support that conclusion. For example, in the October 2015 function report, Jennings indicated that it was very difficult for him to dress and to use the toilet, but the ALJ noted that Jennings had not reported any such difficulties while he was being treated at MBCHC the year before. (AR 21.) In November 2015, Jennings was examined by consulting physician Dr. Hector J. Meruelo, who recorded that he believed that Jennings was capable of walking in the office without the cane that Jennings had brought there.[7] (*Id.*) In January and February 2017, Jennings

---

[7]     The ALJ incorrectly spells Dr. Meruelo's name "Meurelo[.]" (AR 21.)

complained of severe lower back pain, but the ALJ pointed out that radiographs of the thoracic and lumbar spine were normal, as was an X-ray of the lumbar spine. (AR 20.) The ALJ also questioned the extent of Jennings's alleged limitations relating to his seizure disorder, given that he had driven himself to the hearing. (AR 21.)

Jennings has not shown that the ALJ failed to cite "substantial, legitimate evidence" to support the conclusion that the alleged limiting effects of Jennings's symptoms are not entirely consistent with the record. *Ulman*, 693 F.3d at 714. As the Commissioner emphasizes (Doc. No. 28), Jennings's claim that his symptoms are consistent with the evidence in the record represents an inversion of the relevant standard. The question is not whether substantial evidence supports the alleged limiting effect of Jennings's symptoms; it is whether the ALJ pointed to substantial, legitimate evidence to support his findings with respect to those symptoms. Jennings has not addressed the multiple reasons that the ALJ offered to justify discounting his symptoms and has therefore failed to show that reversal is warranted on this ground.

**IV.     Recommendation**

For the foregoing reasons, the Magistrate Judge RECOMMENDS that Jennings's motion for judgement on the administrative record (Doc. No. 26) be GRANTED, that the decision of the Commissioner be REVERSED, and that this case be REMANDED for further administrative proceedings consistent with this report and recommendation.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 25th day of February, 2020.

ALISTAIR E. NEWBERN
United States Magistrate Judge

23